IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TETRA FINANCIAL GROUP, LLC, a Utah limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> THE MAPP GROUP, LLC, a Louisiana limited liability company, *et al.*, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:09-cv-942 CW |

In this diversity action, Plaintiff Tetra Financial Group ("Tetra") brings suit against Defendants The MAPP Group LLC, MAPP Construction, LLC (together, the "MAPP entities"), and Grif McKowen. All of Tetra's claims relate to funding Tetra provided to the owner to pay the MAPP entities for a construction project. Tetra asserts claims of breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, promissory estoppel, and unjust enrichment against the MAPP entities. Tetra brings claims of fraud and fraudulent concealment against all of the Defendants.

The Defendants have filed for summary judgment on each of Tetra's claims. In response, Tetra filed a cross motion for partial summary judgment on one aspect of its breach of contract claim against the MAPP entities. For the reasons discussed below, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment and DENIES Tetra's cross motion for summary judgment.[1]

---

[1] In response to Defendants' motion, Tetra moved to continue summary judgment briefing to allow additional discovery. After Tetra made that motion, however, the parties engaged in

## BACKGROUND

Sometime prior to Spring 2007, Cameron Kuhn, then manager of Plaza Theaters LLC ("Plaza Theaters") and its associated entity Plaza Entertainment LLC[2], hired MAPP Construction LLC ("MAPP") as general contractor for a theater construction project (the "Plaza Theater Project"). The Plaza Theater Project is located in Orlando, Florida. The project was intended to be a state of the art movie theater in a large complex called Plaza Tower. In Spring 2007, Plaza Theaters began to fall behind in its payments to MAPP. As a result, construction on the Plaza Theater Project drew to a halt in early June 2007.

Shortly thereafter, Mr. Kuhn asked Drew Schott, MAPP's division manager in Orlando, how much funding MAPP would need to finish the Plaza Theater Project. According to Mr. Kuhn, Mr. Schott told him that if Plaza Theaters "became current on its bills to MAPP, MAPP would return to work and complete the Plaza Theater." (Kuhn Decl. ¶ 10, Dkt. No. 32-4.) David Dix, Plaza's Chief Operating Officer, also testified to hearing Mr. Schott say that if Plaza Theaters "g[o]t current . . . they [MAPP] will finish the theater." (Dix Depo. at 98, Dkt. No. 54-3.) In addition, Richard Compton, who was both a subcontractor and a Plaza Theaters employee, also testified to hearing MAPP affirmatively state during various meetings he attended during this period of time that if Mr. Kuhn got MAPP current, "it would return to the theater and finish

---

further discovery and submitted supplemental briefing related to that discovery. Tetra's motion to continue is therefore DENIED as moot.

[2] The parties refer to both Plaza Theaters and Plaza Entertainment in correspondence and testimony. Plaza Theaters ultimately entered into the financing arrangement referred to as the Master Lease. Because the distinction between Plaza Theaters and Plaza Entertainment does not appear to change the nature of the claims or defenses, the court refers throughout this memorandum to the owner of the project as Plaza Theaters without distinction between the entities.

the job." (Compton Depo. at 23, Dkt. No.54-6.)  Mr. Compton did not specify whether any of these meetings occurred before or after October 2, 2007.

Mr. Kuhn then approached Tetra to secure funding to complete the Plaza Theater Project. Mr. Kuhn told Tetra that "$3,073,576.47 to MAPP. . . would be sufficient to get MAPP to complete the theater."  (Kuhn Decl. ¶17, Dkt. No. 32-4).  Subsequently, on or around August 28, 2007, Tetra and Plaza Theaters entered into a letter of intent for Tetra to provide funding under a lease arrangement in which Tetra would purchase the equipment from Universal Cinema, a theater equipment provider, and lease it to Plaza Theaters.  The lease was personally guaranteed by Cameron Kuhn, the Chief Executive Officer of Plaza Theaters.  The financing was to include the theater equipment, and the cost of the construction and improvements.

Tetra agreed to fund a little more than $5 million, with approximately $2 million to be paid to Universal Cinema for the equipment and $3.07 million to go to MAPP for the build out. Trey Turley, Tetra's sales representative, testified that at the time that Tetra signed the letter of intent, Tetra was under the impression that the funding would be used to finish the theater.  He points to language in the letter of intent stating that the funding was for "furniture, fixtures, and equipment," among other parts, as supporting Tetra's understanding.  (Turley Depo. at 83- 84, Dkt. No. 32-7.)

In early September, 2007, Tetra notified Plaza Theaters that before Tetra would fund, Tetra required invoices from MAPP and Universal Cinema.  Brian Greco, a Plaza Theaters employee, conveyed Tetra's request to Sean Gerlin, MAPP's assistant project manager.  On September 7, 2007, Mr. Gerlin prepared and submitted to Mr. Greco an invoice for $6 million. Grif McKowen, MAPP's CFO, testified that "the $6 million represented the amount that

3

[MAPP] was owed to complete the project. . ."  (McKowen Depo. at 56, Dkt. No. 32-3.)  After

he received the $6 million invoice, Mr. Greco emailed Mr. Gerlin on September 10, 2007, and

stated as follows:

> Please eliminate General Conditions amount for $299,451.56 and Change Order Amount
> for $2,703,170.29.  Total invoice should be around $3,073,576.47. . . .  I cannot show the
> bank a 6 million owed as this loan was only for 5 million total with 2.3 million going
> toward UCS equipment.

(Ex. 75 to McKowen Depo., Dkt No. 32-3.)  Later on September 10, Mr. Gerlin returned the

invoice to Mr. Greco with the requested changes in place, reflecting a total cost of $3,073,576.47.

Plaza Theaters then provided a copy of that invoice to Tetra.

On about October 2, 2007, Mr. Turley told Mr. McKowen of MAPP that Tetra had asked

for additional documentation to support the September 10 invoice.  On October 11, 2007, MAPP

again provided Tetra with an invoice for $3.07 million with numerous invoices from individual

subcontractors attached (the "MAPP Invoice").

On October 5, 2007 Tetra emailed the printed form Master Lease Agreement dated as of

October 2, 2007 to Mr. Kuhn and Mr. Greco ("the Master Lease").  Mr. Kuhn signed the Master

Lease both as the manager of Plaza Theaters and individually on October 22, 2007.  Under the

lease, Tetra agreed to lease the property listed on an attached schedule to Plaza Theaters in

exchange for its payment of the rent.  The parties have not provided the court with a copy of the

attached schedule.  Pursuant to the financing arrangement, Tetra was to advance a total of

$5,153,249 of which $3,073,567.47 was to be paid to MAPP and the remainder to Universal

Cinema. Tetra, however, did not release funds to MAPP until early November  2007.

During October 2007, Ryan Secrist, Tetra's manager for the Plaza Theater Project deal,

had multiple phone conversations with Mr. McKowen.  Mr. Secrist testified that during one of

those calls, Mr. McKowen represented to him that the Plaza Theater Project was scheduled to

open by "Christmas of 2007."  (Secrist Depo. at 75-76, Dkt. No. 32-8.)  Mr. Secrist further

testified that McKowen told him during these phone calls that the funding would be sufficient for

MAPP to complete the project.  MAPP disputes that it made any representations that the project

would be completed without payment for additional work yet to be done.

As a condition of disbursing the funds, Scott Scharman, Tetra's CEO, requested that

Tetra be allowed to pay the subcontractors directly on the Plaza Theater Project instead of paying

MAPP as the general contractor.  MAPP would not agree to that arrangement.  MAPP urged that

it was its right to deal directly with the subcontractors to verify payment and assure that lien

releases were obtained.  *See, e.g.,* Scharman Depo., at 105-106, Dkt No. 23-1at Ex. G and

McKowen email of 10/12/97, Dkt. No. 23-1 at Ex. S.  To resolve this impasse, MAPP and Tetra

began discussions about MAPP agreeing to indemnify Tetra for claims that may be made against

the project by the subcontractors should MAPP fail to make the required payments.

Sometime prior to reaching agreement on indemnification, Mr. Scharman had a phone

conference with Michael Polito, CEO of MAPP.  Mr. Scharman testified that during that

conversation, Mr. Polito told Mr. Scharman that MAPP needed the approximately $3 million "so

they [MAPP] could get the project finished and open."  (Scharman Depo. at 97, Dkt. No. 33.)

On November 5, 2007, the parties reached agreement that the funds would be paid directly to

MAPP.  MAPP, the MAPP Group, and Tetra then executed the Indemnification Agreement.  On

about that same date, Tetra paid the approximately $3.07 million to the MAPP entities.[3]

On November 7, 2007, MAPP notified each of its subcontractors that it had received funding for "our current due by the Plaza LLC" and to call the office if they were expecting funding and to be notified of documents required to receive a check.  (Dkt. No. 32, Ex. N.) MAPP then paid the subcontractors upon their execution of a "Waiver and Release of Lien Upon Progress Payment."  The Release provided in relevant part that the subcontractor, in consideration of the progress payment being made, "hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished through 10/31/07 to MAPP Construction on the job of Plaza Theater LLC . . ." (Lien Release, Dkt. No. 32-5 at p. 14 of 27.)  MAPP settled with the subcontractors for approximately $500,000 less than the $3.07 million it received from Tetra.  The record is unclear whether the amount not paid to subcontractors was for work completed by MAPP.   Further, MAPP has provided payment records to subcontractors totaling about $2 million, but states without providing records that the additional $500,000 was paid to other subcontractors and service providers.  In response to discovery requests asking MAPP how they distributed the $3.07 million, the MAPP entities responded, in part, that:

> Of course, MAPP's disbursement of the Tetra funds has no correlation with the MAPP invoice that was provided to Tetra in support of the equipment lease that Tetra entered into with Kuhn and Plaza Entertainment.  Pursuant to Kuhn's and Tetra's request and instruction, MAPP's invoice was merely to provide Tetra with documentary support for the equipment it purchased from Kuhn pursuant to the equipment lease.

(MAPP Entities' Response to Interrog. No. 6, Dkt. No. 56-6.)

Mr. McKowen stated in his deposition that some of the items included in the invoice that

---

[3] Defendants have moved to strike a declaration of Mr. Scharman about what Tetra would have done had it possessed certain information.  Because the court did not rely on this declaration in the course of its analysis in this case, that motion is DENIED as moot.

MAPP provided to Tetra were not installed at the time MAPP received the $3.07 million.  (*See* McKowen Depo. at 91, Dkt. No. 54-2.)  Because neither MAPP nor any of the subcontractors returned to work, some of the equipment Tetra paid for was never installed.

After receiving funding from Tetra, MAPP and at least one of its sub-contractors refused to return to work until Plaza Theaters could show evidence of sufficient funds to pay future costs to complete the Plaza Theater.  (*See* Polito Depo. at 11-12, Dkt. No. 54-5 and Neal Depo. at 15, Dkt. No. 59-1.)  Mr. Polito, MAPP's CEO, testified that he had made it clear to Mr. Kuhn that MAPP would need assurances of Mr. Kuhn's ability to fund the completion of the project. (*See* Polito Depo. at 11-12, Dkt. No. 54-5.)  The Plaza Theater Project was not completed by December 2007, nor did MAPP return to work on the project.

Plaza Theater LLC defaulted under the Master Lease and Tetra seeks, in addition to its other remedies, indemnification from MAPP to reimburse it for damages arising from its payments to MAPP.  Tetra also seeks to recover damages claiming fraud and other tort theories.

## ANALYSIS

### I.  Summary Judgment Standards

Federal Rule of Civil Procedure 56 allows a court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998).  Courts must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  *Applied*

*Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

## II.     Breach of Contract (Indemnification)

Tetra contends that the MAPP entities breached the Indemnification Agreement in two ways.  First, Tetra asserts the MAPP entities breached Paragraph One; Tetra and the MAPP entities have each filed cross motions for summary judgment on this claim.  Second, Tetra claims that the MAPP entities breached Paragraph Two; the MAPP entities have moved for summary judgment on this claim.

The Indemnification Agreement contains a choice of law provision selecting Utah law as applying to contractual disputes.  The elements of a breach of contract claim under Utah law are "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."  *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001) (citation omitted).  Indemnity contracts are subject to the same rules of construction as other contracts.  *Pavoni v.  Nielsen*, 999 P.2d 595, 599 (Utah Ct. App. 2000).

> Well-accepted rules of contract interpretation require that we examine the language of a contract to determine meaning and intent.  *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235.  Where the language is unambiguous, "the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law."  *Id.* (internal quotation marks omitted).  We will also "consider each contract provision ... in relation to all of the others, with a view toward giving effect to all and ignoring none."  *Id.* (ellipses in original) (internal quotation marks omitted).  The court considers extrinsic evidence of the parties' intent only if the language of the contract is ambiguous.  *Id.*  A contractual term or provision is ambiguous "if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."  *Id.* (internal quotation marks omitted).  When determining whether the plain language is ambiguous, "we attempt to harmonize all of the contract's provisions and all of its terms."  *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599.

*Glenn v. Reese*, 225 P.3d 185, 188-89 (Utah 2009).

"In addition, we interpret the terms of a contract in light of the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract." *Peirce v. Peirce*, 994 P.2d 193, 198 (Utah 2000).  Under Utah law, the court may rely on extrinsic evidence to understand the circumstances and purpose of the contract. *Id.*  The court may also consider extrinsic evidence to identify an ambiguity in a contract when the alternative readings of a provision argued by the adverse parties are "reasonably supported by the language of the contract." *Daines v. Vincent*, 190 P.3d 1269, 1276 (Utah 2008).

Tetra argues that Paragraphs One and Two of the Indemnification Agreement require the MAPP entities to hold it harmless for injury it claims to have suffered because the Plaza Theater Project was never completed.  Tetra argues that if all of the subcontractors had been paid the full amounts they claimed, they would have returned to work, the project would have been completed timely, and Plaza Theaters would not have defaulted on the Master Lease.[4]  The MAPP entities counter that Tetra's claim is not within the purpose or obligations that they accepted.

Paragraph One of the Indemnification Agreement, entitled "Payments of Obligations," reads as follows:

> Upon receipt of the Wired Funds [the $3.07 million], the Indemnifying Parties [the MAPP entities] shall immediately pay all obligations of every nature relating to and in connection with the Contractor Services, including without limitation all obligations set forth in the Invoice and all amounts due to, or claiming by, subcontractors who have performed any of the Services.

---

[4] Tetra's claim would require the fact finder to speculate about multiple levels of events to conclude Tetra should prevail on its claim.  Would the subcontractors have gone back to work without assurance that additional work would also be paid?  Would the project have been completed on time?  Would the project have been financially successful and would Plaza Theaters have fully performed under the Master Lease?  The court, however,  does not need to resolve the issue of whether the claims are too speculative to prevail because the claims under the Indemnification Agreement fail as a matter of contract interpretation.

(Indemnification Agreement, ¶ 1, Dkt. No. 32-12.)  "Services" is defined as "those certain general contractor, construction and other services to Plaza Theaters, either directly or through subcontractors, pursuant to and in connection with Invoice No. 97039-002 REV, dated October 10, 2007."  (*Id.*)  Tetra argues that the words "pay all obligations of every nature" should be read as requiring the MAPP entities to pay every claim submitted and that MAPP's failure to do so lead to the failure of the project.

It is undisputed that the referenced Invoice is the invoice for $3.07 million and that when the MAPP entities received the $3.07 million from Tetra, MAPP made only partial payments to its subcontractors.  The MAPP entities point out, however, that they successfully resolved all claims for work completed through October 31, 2007 and received releases through that date. Tetra does not dispute these facts.

The MAPP entities argue that under the proper interpretation of the Indemnification Agreement, they fully discharged their responsibility. The MAPP entities further argue that Tetra's interpretation of Paragraph One would require the MAPP entities to have paid any amount claimed by any subcontractor even if a subcontractor submitted a claim for work that was not completed or subject to a back charge for causing additional expense or delay or subject to other legitimate challenges.

Although Tetra's reading of Paragraph One may be arguable were the court to consider only the specific language that the MAPP entities "pay all obligations," it is not sustainable when the purpose of the agreement is considered and the contract is read as a whole.  It is undisputed that the Indemnification Agreement was entered to resolve a disagreement between Tetra's preference to pay the funds directly to the subcontractors and MAPP's insistence that the funds

10

be paid to MAPP, allowing it as the general contractor to resolve claims made by the subcontractors.  The equipment, fixtures and other equipment which were leased to Plaza Theaters were Tetra's security to ensure Plaza Theaters performed its obligations under the Master Lease.  Thus, Tetra reasonably needed assurance that the subcontractors would be paid and its security would not be encumbered by liens and subject to other claims.  On the other hand, only MAPP was in a position to assess whether subcontractors were entitled to all of the amounts they claimed and legally, as the general contractor, to settle those claims.  The parties chose the Indemnification Agreement as a way to protect the interests of both parties.  Its purpose was to protect Tetra from the risk that MAPP would not pay the subcontractors, thus requiring Tetra to advance additional funds to clear liens or otherwise resolve claims against the project made by the subcontractors, while allowing MAPP to resolve the subcontractor claims.

The effect of Tetra's interpretation would be to make the MAPP entities guarantors of Plaza Theaters' performance of the Master Lease.  Tetra  has not offered evidence that the parties discussed the MAPP entities accepting such a broad responsibility nor does there appear on this record any economic or other reason why the MAPP entities would do so.

That the purpose of the Indemnification Agreement was to protect Tetra against the risk that subcontractors would make claims against the project is evident from reading the agreement as a whole.  The key language of the indemnifying obligation reads in relevant part as follows:

> The Indemnifying Parties . . . agree to, and shall indemnify, defend and hold harmless the Indemnified Party, and shall reimburse the Indemnified Party for any and all claims, damages, costs . . . incurred or suffered by the Indemnified Party as a result of, relating to or arising from the Indemnified Party's **payment of the Wired Funds to MAPP Construction and the Services**, including without limitation any **liens . . ., including mechanics liens, recorded, filed or asserted against any of the real or personal property** of Plaza Theaters' [sic] in connection with the Services . . .

11

(Indemnification Agreement, ¶ 2, Dkt. No. 32-12)(emphasis added.)   The MAPP entities agreed to hold Tetra harmless from damages caused by three actions: (1) payment of the money directly to MAPP, as opposed to paying the subcontractors, (2) the Services, i.e, the work and materials listed in the invoice, and (3) liens recorded against the Plaza Theaters' real or personal property by subcontractors.  The risk of this harm to Tetra flowed from MAPP being responsible for the Services and for paying the subcontractors for those Services.  None of these risks contemplate the MAPP entities assuming the risk that Plaza Theater would fail to complete the project or default on the Master Lease.

This intent of the Indemnification Agreement is further confirmed by the "Termination" provision which reads as follows:

> This Agreement shall terminate upon the satisfaction and release of all liens, encumbrances, charges, pledges or other claims, of whatever nature, including mechanics liens, recorded, filed or asserted against any of the real or personal property of Plaza Theaters' in connection with the Services.

(*Id.,* ¶ 10.)  This language makes clear that the MAPP entities' obligation to protect Tetra ended upon "satisfaction and release" of liens filed and claims made "against the real or personal property" of the Plaza Theaters "in connection with the Services."  Claims made that are not "in connection with the Services," such as Plaza Theaters' default on the Master Lease, were not contemplated as being part of the responsibilities the MAPP entities agreed to accept.

Read in the light of these other provisions and the purpose of the Indemnification Agreement, Paragraph One cannot reasonably be construed to require MAPP to pay all claims made by subcontractors, regardless of merit.  The language of the paragraph does not obligate the MAPP entities to make payments to the subcontractors beyond what they believed the

subcontractors could legitimately claim.  And the payments the MAPP entities made to the subcontractors were, as a practical matter, all that the subcontractors claim was due to them.  The interpretation of Paragraph One required when the agreement is read as whole and against its purpose does not allow a claim that the MAPP entities breached by failing to pay every claim submitted and precludes Tetra's claim that, had the subcontractors been paid the full amount of what they submitted, they would have completed the project and Plaza Theaters would not have defaulted on the Master Lease.  In context and considering the purpose for the Indemnification Agreement, Paragraph One cannot reasonably be construed to support Tetra's claim for breach.

Tetra's claim under Paragraph Two of the Indemnification Agreement fails for the same reasons.  Tetra argues that the language requiring the MAPP entities to indemnify it from any damage suffered by Tetra "as a result of, relating to or arising from" the payment of funds should be read broadly enough to include damages it claims were caused as a consequence of the MAPP entities not paying the subcontractors all amounts they claimed.  This argument again ignores that the purpose of the Indemnification Agreement was to protect against the risk of payments being made to MAPP rather than directly to the subcontractors, resulting in claims against the project.  Tetra's claimed damages were not caused by claims being made against the project, but by Plaza Theaters' failure to perform on the Master Lease.

It is undisputed that the subcontractors have not brought any unresolved legal action for unpaid amounts relating to the project against either the MAPP entities or Tetra.  Nor are there claims made against the Plaza Theaters' real or personal property that have caused injury to Tetra.  Finally, Tetra does not claim harm to it caused by the Services performed by the MAPP entities or the subcontractors.  The purpose of the Indemnification Agreement was to protect

13

Tetra from these risks.  Tetra seeks to recover under the Indemnification Agreement for Plaza Theaters' failure to perform under the Master Lease.  That harm was not within the reasonable contemplation of the parties to the Indemnification Agreement and Tetra's claims under that agreement fail as a matter of law.

## III.    Breach of Good Faith and Fair Dealing

In addition to the express breach of contract claims, the MAPP entities seek judgment on Tetra's claim that they breached the covenant of good faith and fair dealing implied in the Indemnification Agreement.   Under this implied covenant, both "parties impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract."  *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 968 (Utah 2008) (citation omitted).  In short, Tetra claims that by not paying all the claims of the subcontractors in full, the MAPP entities frustrated Tetra's expectation that the Plaza Theater Project would be completed and Plaza would pay under the lease agreement.  As explained below, this claim fails.

The Utah Supreme Court has explained the duty of good faith as follows:

> While a covenant of good faith and fair dealing inheres in almost every contract, some general principles limit the scope of the covenant. . . .  First, this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante. Second, this covenant cannot create rights and duties inconsistent with express contractual terms.  Third, this covenant cannot compel a contractual party to exercise a contractual right "to its own detriment for the purpose of benefitting another party to the contract."  *Olympus Hills Shopping Ctr. v. Smith's Food & Drug Ctrs.*, 889 P.2d 445, 457 n. 13 (Utah Ct.App. 1994). Finally, we will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract.

*Oakwood Village LLC v. Albertson's Inc.*, 104 P.3d 1226, 1240 (Utah 2004) (citations omitted).

Tetra's claim is barred by the limitations set out above.  First, as discussed, Tetra has not

14

presented any evidence to suggest that the parties intended that the Indemnification Agreement should be anything more than an indemnification agreement.  There is nothing to suggest that the parties bargained for the contract to cover the sort of losses Tetra contemplates here.

Second, Tetra's claim would create rights and duties not consistent with the written contract.  Again, the contract was intended to cover losses related to subcontractors claiming against Tetra, not other kinds of losses.  Accordingly, the MAPP entities are entitled to judgment on Tetra's claim for breach of the implied covenant of good faith and fair dealing.

## IV.    Fraudulent Misrepresentation

The Defendants have also moved for summary judgment on Tetra's claim for fraud.  In summary, Tetra claims that the Defendants falsely represented that if Tetra funded the $3.07 million, then the MAPP entities would return to work and finish the Plaza Theater Project.  Tetra further argues that at the time the MAPP entities made these representations the MAPP entities had no intention to return to work unless Plaza Theaters could ensure that it had additional funding to complete the project.  Tetra claims the MAPP entities never told it this true intent. Without those representations, Tetra contends, it would not have funded the Master Lease and would have avoided damages it suffered from Plaza Theater's failure to perform. To prevail in a claim for fraud, Tetra must show the following:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066-67 (Utah 1996).  Defendants contend

15

that Tetra's fraud claim fails as a matter of law on the sixth, seventh and eighth elements.

On the sixth element, the Defendants argue that Tetra failed to act reasonably.  The Utah Supreme Court has explained that "while the question of reasonable reliance is usually a matter within the province of the jury . . . there are instances where courts may conclude that as a matter of law, there was no reasonable reliance."  *Id.* at 1067.

The MAPP entities contend that the subcontractor invoices attached to the MAPP Invoice made it obvious that the $3.07 million Tetra was paying to the MAPP entities was not going to be sufficient to cover the cost of completing the Plaza Theater Project.  The MAPP entities further argue that it should have been obvious to Tetra that the Plaza Theater Project was not complete, and that a simple visit to the project site would have alerted Tetra that the funding would not be enough to finish it.  They conclude that because Tetra had the invoices and should have been aware that the funding was not realistically enough to finish the project, Tetra's asserted reliance on any of their statements was unreasonable as a matter of law.

While the MAPP entities' argument is not without merit, Tetra has presented sufficient evidence to put the question of the reasonableness of Tetra's reliance in dispute.  In short, the record contains facts from which a jury could reasonably conclude that Tetra's asserted reliance on Defendants' statements was reasonable.  For example, Mr. Secrist of Tetra testified that Mr. McKowen of MAPP told him that the Plaza Theater Project was scheduled to open by Christmas 2007.  (*See* Secrist Depo. at 75-76, Dkt. No. 32-8.)  Moreover, Mr. Scharman of Tetra testified that Mr. Polito of MAPP told him that MAPP needed the $3.07 million "so they [MAPP] could get the project finished and open."  (Scharman Depo. at 97, Dkt. No. 33.)

Moreover, even if the subcontractor invoices attached to the MAPP Invoice were taken

16

into account, their presence was not adequate to conclude as a mater of law that Tetra was on notice of a problem.  As the MAPP entities themselves acknowledge, the MAPP Invoice does not accurately reflect– or have any obvious connection to– the amounts claiming by the subcontractors in the associated invoices.  Further, it would be speculative at this point to conclude that a visit to the project would have been enough to warn Tetra that its asserted impressions about the status of the project were incorrect.  Accordingly, the factual bases of the MAPP entities' arguments do not support a legal conclusion that Tetra acted unreasonably; that issue will be a matter for the jury.

On the seventh and eighth elements, Defendants argue that Tetra did not, as a factual matter, actually act in reliance on any representation by the Defendants.  Specifically, Defendants argue that Tetra had already made its decision to pay the MAPP entities the $3.07 million before Defendants made any representations directly to Tetra.

This defense is also an issue that must be resolved by a jury.  The facts do not indisputably support a finding as a matter of law that Tetra would have released the funds directly to the MAPP entities absent the representations Tetra contends the Defendants made about the completion of the project.  After entering the Master Lease, but prior to releasing the funds, Tetra expressed a preference to pay the subcontractors directly, rather than release the funds to the MAPP entities.  A jury may find that notwithstanding its financing commitment, Tetra would have refused to release the funds had it known what it contends was the true status of the project.  Moreover, if Plaza Theaters induced Tetra to sign the Master Lease by knowingly making false statements, Tetra may have been excused from performance if the MAPP entities had not made statements that supported the statements made by Plaza Theaters.  When the

17

inferences are drawn most favorably to Tetra, the record includes evidence sufficient for a jury to find that Plaza Theaters purposely gave a false impression to Tetra about what amount would be needed to complete the project.  Accordingly, neither a conclusion that Tetra relied exclusively on Plaza Theaters nor a conclusion that Tetra inevitably would have advanced the funds to the MAPP entities notwithstanding the alleged misrepresentations by Defendants is compelled by this record.

For all these reasons, Defendants' motion for summary judgment on Tetra's fraud claim against them is denied.

**V.      Fraudulent Concealment**

Defendants seek summary judgment on Tetra's claim of fraudulent concealment. Fraudulent concealment consists of three elements under Utah law: "(1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) that there is a legal duty to communicate."  *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 286 (Utah 2006).

In its complaint, Tetra alleges that Defendants fraudulently withheld five facts:

(i) MAPP had already abandoned the Theater Project; (ii) MAPP had no intention of completing the Theater Project; (iii) MAPP was in a long-standing dispute with the Lessee and that MAPP claimed Lessee was in default under its agreement with MAPP; (iv) the Theater Project would never open on schedule; and (v) that Tetra's funding was not sufficient to complete the Theater Project.

(Compl. ¶ 63. Dkt. No. 2-3.)  For purposes of this motion, Defendants have limited their argument to an assertion that they did not have a duty to disclose any of these facts to Tetra. Accordingly, the court assumes in its analysis that the first two elements are met.

18

To support their argument that they had no duty to disclose, Defendants maintain that they had a very limited relationship with Tetra.  That is, Defendants contend that their role in this case was limited to being the general contractor on the Plaza Theater Project, and that the Indemnification Agreement was merely to provide protection to Tetra against liens.  Drawing all inferences in favor of Tetra, the court must conclude that the factual record would support a jury finding that Defendants entered into their own independent discussions with Tetra to facilitate completion of the financing for their own self-interest, including the amount of funding Tetra would provide, when Tetra would provide the funding, and to whom Tetra would release the funds.  Defendants cannot prevail as a matter of law on this record that they had no duty in that situation to disclose material facts known to them.  Because Defendants' sole argument on this claim fails, its motion for summary judgment is denied.

## VI.    Negligent Misrepresentation

The MAPP entities also seek summary judgment on Tetra's claim of negligent misrepresentation.  Their sole argument in favor of this motion is that Tetra did not reasonably rely on any representation by the MAPP entities.  As explained above, however, the MAPP entities have not established that the undisputed facts support this conclusion.  Accordingly, their motion on this claim is denied.

## VII.    Promissory Estoppel

At the hearing on this matter held on July 29, 2011, the court observed from the bench that Tetra's promissory estoppel claim is likely extraneous in light of Tetra's other claims.  Tetra conceded that the claim was superfluous.  Accordingly, the court grants the MAPP entities' motion for summary judgment with respect to Tetra's claim of promissory estoppel.

19

## VIII.   Unjust Enrichment

Finally, the MAPP entities move for judgment in their favor on Tetra's unjust enrichment claim.  Unjust enrichment is a tool of equity and should only be employed "when no express contract is present."  *TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 199 P.3d 929, 933 (Utah 2008).  Here, the Indemnification Agreement between Tetra and the MAPP entities precludes a claim of unjust enrichment.  The parties expressly contemplated certain risks associated with Tetra's payment of the funds to the MAPP entities in that contract.  There is no dispute of fact that the potential harm contemplated by that payment was not incurred in this case; answering for this potential harm was the extent of the risk the MAPP entities agreed to bear.

Moreover, Tetra did not simply pay the MAPP entities out of the blue.  To the contrary, Tetra provided the $3.07 million to the MAPP entities with an agreement from Plaza Theaters and Mr. Kuhn that they would repay Tetra that money.  If Tetra can prove that the MAPP entities made false representations to induce Tetra to agree and pay, then Tetra can collect from the MAPP entities under the fraud theory.  If Tetra cannot prove this claim, then it has a legal recourse against Plaza Theaters and Mr. Kuhn for the full $3.07 million and no unjust enrichment claim would lie against the MAPP entities.  Either way, this claim fails.  Accordingly, the MAPP entities' motion is granted with respect to this claim.

## CONCLUSION

For the reasons set forth above, the court ORDERS as follows:

Defendants' motion for summary judgment (Dkt. No. 22) is GRANTED in part and DENIED in part, as specified above;

Tetra's motion to continue (Dkt. No. 34) is DENIED as moot;

Tetra's motion for partial summary judgment (Dkt. No. 55) is DENIED; and

Defendants' motion to strike (Dkt. No. 57) is DENIED as moot.

SO ORDERED this 6th day of January, 2012.

BY THE COURT:

_____

Clark Waddoups
United States District Judge